IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GENE GILBERT ELLIS,

    Plaintiff,

v.                                                                        CIV 15-0848 JCH/KBM

GERMAN FRANCO, VINCE VIGIL,
ALISHA TAFOYA-LUCERO,
COLLEEN MCCARNEY, and
HECTOR CARDENAS,

    Defendants.

## **PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

THIS MATTER came before the Court on Defendants' Supplemental *Martinez* Report (*Doc. 69*), filed December 30, 2016. Also before the Court are Plaintiff's most recent Motions to supplement and amend the Complaint. *See Docs. 83, 85, 87*. The Honorable Judith C. Herrera referred this matter to me on September 29, 2015, "to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case." *Doc. 6* at 1. In my Order requiring the filing of the Supplemental *Martinez* Report, I informed the parties that the Report "may be used in a variety of contexts, including motion for summary judgment or *sua sponte* entry of summary judgment." *Doc. 62* at 2. For the reasons that follow, the Court recommends that Plaintiff's most recent motions to amend and supplement the Complaint be denied, summary judgment be entered in Defendants' favor, and that this action be dismissed with prejudice.

## I. Background[1]

Plaintiff is a convicted sex offender who was sentenced to 43 years in the custody of the New Mexico Corrections Department on or about June 20, 2013.[2] On January 6, 2015, Plaintiff was transferred into the Penitentiary of New Mexico ("PNM") from the Guadalupe County Correctional Facility ("GCCF"). *Doc. 69-69* at 2.[3] Plaintiff remained at PNM until January 27, 2016, when he was transferred to the Southern New Mexico Correctional Facility. *Doc. 69-69* at 2.

Throughout his stay at PNM, Plaintiff asserted that he was not safe because of his status as a sex offender. *Doc. 69-78* at 3. Plaintiff further claimed that he had enemies at PNM. *Doc. 69-78* at 3. Due to these concerns, Plaintiff was re-assigned to several different pods[4] within PNM. *Doc. 69-78* at 3. Notwithstanding these moves, Plaintiff continued to allege that it was unsafe for him to leave his cell and interact with other inmates in the various pods to which he was assigned. *Doc. 69-78* at 3. Plaintiff

---

[1] The following facts are supported by competent, admissible evidence and are undisputed.

[2] Plaintiff's Amended Complaint states that "on or about June 20, 2013, [he] was convicted of 1 count of kidnapping in the 1st degree, 4 counts of criminal sexual penetration in the 2nd degree, 1 count of criminal sexual contact of a minor in the 2nd degree, aggravated assault with a deadly weapon in the 4th degree, aggravated burglary in the 2nd degree, and bribery of a witness in the 3rd degree." *Doc. 11* ¶ 9.)

[3] The New Mexico Corrections Department transferred Plaintiff to PNM because he was reclassified from Level III to Level IV after a disciplinary incident. *See Doc. 69-160* at 2. The New Mexico Corrections Department "utilizes an objective rating process to assign inmates to the most appropriate custody level consistent with the safety of the general public, staff and other inmates." *Doc. 69-42* at 3. The process employs a numerical classification system, with Level I representing the lowest level of security risk and Level VI representing the highest. *Doc. 69-160* at 2; *see also Doc. 69-42* at 6-9. While housed at PNM, Plaintiff was classified as a Level IV inmate. *Doc. 69-78* at 2. Level IV is the highest "general population" security level; inmates who are classified as Level V or VI are not considered "general population." *Doc. 69-78* at 2. Level IV inmates cannot be housed at GCCF. *Doc. 69-78* at 3.

[4] "Inmates are housed in cells grouped into pods. There are twelve inmate cells in a pod. Inmates interact with other inmates in their pod at Level IV. Inmates do not interact with inmates from other pods." *Doc. 69-78* at 3.

2

claims that he was forced to refuse showers and recreation "because attending these functions require being placed among the inmates who are threatening [him]." *Doc. 1* at 2; *see also Doc. 34* at 1 (alleging that a fellow inmate told Plaintiff that "if he did not stay in his cell he would be assaulted"). Plaintiff eventually threatened or attempted self-harm on several occasions. *Doc. 69-78* at 4. Plaintiff asserts that he took these actions due to the "irreparable mental trauma" he endured "due to the stress of prolonged exposure to threats[.]" *Doc. 11* at 12.

Plaintiff filed his Civil Rights Complaint pursuant to 42 U.S.C. § 1983 on September 23, 2015. *See Doc. 1*. Plaintiff has since amended and supplemented his Complaint. *See Docs. 11, 16, 17, 20, 21*. Plaintiff's amended and supplemented Complaint alleges that PNM Warden German Franco, Deputy Warden Alisha Tafoya-Lucero, Security Captain Hector Cardenas, Unit Manager Vince Vigil, and New Mexico Corrections Department Classification Bureau Chief Colleen McCarney failed to protect him against violence by other inmates in violation of his Eighth Amendment rights by refusing to transfer him out of PNM's general population. *See Doc. 11* at 2-14; *see also Doc. 25* at 6.

Plaintiff further alleges that Unit Manager Vigil retaliated against him in violation of the First Amendment after he filed the present lawsuit. *See Docs. 16, 17*; *see also Doc. 25* at 4, 6. Specifically, Plaintiff alleges that Defendant Vigil refused to transfer him into a different pod for his own protection after Plaintiff filed this action. *See Doc. 69-71* at 1. Plaintiff further alleges that Defendant Vigil ignored his concern that there was a piece of metal in his cell, later raided Plaintiff's cell to recover the item, and subjected Plaintiff to disciplinary segregation as a result of the find. *See Doc. 11* at 11; *Doc. 69-78*

at 4-5. Plaintiff also cursorily alleges that Defendant Vigil told other corrections officers that Plaintiff "is writing notes to unit manager Vince Vigil about other inmates. This is seen by other prisoners as being a 'snitch.'" *Doc. 11* at 8.

Plaintiff's allegations were investigated by Defendants. Pertinent here, Defendants' investigation revealed that Plaintiff was openly telling other inmates in the pod what his charges are in an effort to be transferred out of PNM and to another facility. *See Doc. 69-114* at 15. Plaintiff sought such a transfer to facilitate being closer to his biological brother (who is also incarcerated in the New Mexico Corrections Department) and for his own safety. *Id.* As summarized by one investigative report,

> Based on all the testimony/evidence gathered in this case, it appears inmate ELLIS has been attempting to be transferred from the Penitentiary of New Mexico using every avenue he knows. Inmate ELLIS attempted to be moved through the Housing Unit Lieutenant and Unit Manager. Inmate ELLIS then began openly advising other inmates of his crimes committed. Inmate ELLIS then stated he was being harassed by Officer SCHLOTTERER in front of other inmates. Inmate ELLIS then is found in possession of dangerous contraband and removed from the unit.
>
> Based on my years of experience working with in the New Mexico Corrections Department, it is apparent that inmate ELLIS is attempting every avenue he can to manipulate the department to move to either GPI-LCCF, or Otero County.

*Doc. 69-114* at 15.

Defendants now move for summary judgment on Plaintiff's claims, asserting that he failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, and, alternatively, that Plaintiff's claims fail on their merits. *See Doc. 69* at 27-33. Plaintiff counters that he indeed exhausted his available administrative remedies, and that summary judgment should be denied because "the simple fact remains that Defendants failed to protect Plaintiff from abuse at the hands of other inmates." *Doc. 89*

4

at 1. For the reasons that follow, the Court agrees with Defendants that Plaintiff's claims are meritless.

## II. Legal Standards

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit under the applicable law will preclude summary judgment. *See Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 34 (10th Cir. 2013).

## III. Exhaustion

"The Prison Litigation Reform Act of 1995 (PLRA) mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) (citing 42 U.S.C. § 1997e(a)). Failure to exhaust is an affirmative defense under the PLRA. *Jones v. Bock*, 549 U.S. 199 (2007). "When raising an affirmative defense in a motion for summary judgment, the defendant must demonstrate that no disputed material fact exists regarding the affirmative defense asserted." *Sparks v. Foster*, 241 F. App'x 467, 472 (10th Cir. 2007) (quoting *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997) (internal quotation marks and ellipsis omitted). "If the defendant meets this initial burden, the plaintiff must then demonstrate with specificity the existence of a disputed material fact[;] [i]f the plaintiff fails to make such a showing, the affirmative defense bars his claim, and the defendant is entitled to judgment as a matter of law." *Id.*; *see* Fed. R. Civ. P. 56(a); *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011) (citing *Jones*, 549 U.S. at 212 ("Failure to exhaust under the PLRA is an affirmative defense. . . .

5

Defendants thus bear the burden of asserting and proving that the plaintiff did not utilize administrative remedies. . . .")).

Exhaustion is mandatory and "is required for any suit challenging prison conditions[.]" *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). As the Tenth Circuit has explained, "Section 1997e(a) says nothing about a prisoner's subjective beliefs, logical or otherwise, about the administrative remedies that might be available to him. The statute's requirements are clear: If administrative remedies are available, the prisoner must exhaust them." *Griffin v. Romero*, 399 F. App'x 349, 351 (10th Cir. 2010) (unpublished) (quoting *Chelette v. Harris*, 229 F. 3d 684, 688 (8th Cir. 2000)). Put simply, if an inmate does not exhaust his available administrative remedies, the Court has no choice but to dismiss his claims. *See Yousef v. Reno*, 254 F.3d 1214, 1221 (10th Cir. 2001).

Inmates need not exhaust administrative remedies that are unavailable, however. *Ross*, 136 S. Ct. at 1859. "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).

"Identifying the exact steps a prisoner must take to exhaust administrative remedies presents a 'choice-of-law issue,' derived from the requirements of the 'prison grievance systems themselves.'" *Howard v. Waide*, 534 F.3d 1227, 1243 (10th Cir. 2008) (quoting *Kikumura v. Osagie*, 461 F.3d 1269, 1282 (10th Cir. 2006); citing *Jones*, 549 U.S. at 199). "[I]t is the prison's requirements . . . that define the boundaries of proper exhaustion." *Howard*, 534 F.3d at 1243-44. In this case, the availability and

6

requirements of the grievance process is governed by the policies attached to

Defendants' Supplemental *Martinez* Report. *See Doc. 69*, Exhibit A.[5]

### A) Available Administrative Remedies

In New Mexico, most inmate grievances are governed by New Mexico Corrections Department Policy CD-150500. *See Doc. 69-1* at 1. Policy CD-150500 applies to "[a]ll inmates incarcerated in the New Mexico Corrections Department . . . ." *Doc. 69-1* at 1. Policy CD-150500 sets forth matters that subject to the grievance procedures and those that are not. "Grievable" matters include:

a. The substance, interpretation and application of policies, rules and procedures of the institution or Department including, but not limited to, decisions regarding mail, visitation, staff treatment, negligence as to lost property or medical/mental health care excluding security issues. [4-4344] [4-4394] [4-4410]

b. Individual employee actions.

c. Perceived reprisal for use of, or participation in, the grievance process.

d. Any other matter relating to conditions of care or supervision within the authority of the New Mexico Corrections Department or its contractors, except as noted herein.

*Doc. 69-*1 at 10; *Doc. 69-*2 at 1.[6]

---

[5] Defendants have attached policies dating back to November 21, 2014, as Plaintiff's allegations relate to his housing at PNM from January 6, 2015 through January 27, 2016. *See Doc. 69* at 7. However, Defendants, and the Court, make reference only to the current version of the policy, as there have been no substantial revisions thereto, and Plaintiff does not argue that there are any pertinent or substantive differences between the different versions. *See generally Doc. 89*; *compare Doc. 69-1 through Doc. 69-3* at 5 (Grievance Policy revised on 06/09/2016) *with Docs. 69-3* at 7 *through Doc. 69-7* at 5 (Grievance Policies revised on 02/13/2015 and 03/11/2014).

[6] The process used for grievable matters is as follows:
   Inmates must attempt to informally resolve their issues before filing a formal grievance. *Doc. 69-2* at 1. Before filing a formal grievance, "an inmate is expected to attempt to resolve the grievance or particular area of concern informally through discussion with the person or persons responsible for the incident, giving rise to the complaint." *Doc. 69-2* at 4. After seeking informal

On the other hand, some matters cannot be addressed by the grievance procedure. The regulations set forth the following list of "exclusions" to grievable issues:

---

resolution, "the inmate shall first file an informal complaint using the Inmate Informal Complaint form . . . within five (5) working days from the date of the incident giving rise to the complaint." *Doc. 69-2* at 4. The Unit Manager, Chief of Security, or Institutions designees in charge of the informal resolution must address the issue and return the Complaint to the inmate, with a copy to the grievance officer, within five working days. *Doc. 69-2* at 4.

Inmates must attempt to informally resolve their issues before filing a formal grievance. *Doc. 69-2* at 1. Before filing a formal grievance, "an inmate is expected to attempt to resolve the grievance or particular area of concern informally through discussion with the person or persons responsible for the incident, giving rise to the complaint." *Doc. 69-2* at 4. After seeking informal resolution, "the inmate shall first file an informal complaint using the Inmate Informal Complaint form . . . within five (5) working days from the date of the incident giving rise to the complaint." *Doc. 69-2* at 4. The Unit Manager, Chief of Security, or Institutions designees in charge of the informal resolution must address the issue and return the Complaint to the inmate, with a copy to the grievance officer, within five working days. *Doc. 69-2* at 4.

The inmate may then file an Inmate Grievance form "within five (5) working days of the receipt of Informal Complainant (sic) to the Institution Grievance Officer" by attaching the non-resolved Informal Complaint and delivering the forms to the Grievance Officer either by placing them into an institutional mailbox or delivering them in person. *Doc. 69-2* at 4-5. This is Step 1 of the grievance process. *See Doc. 69-2* at 12. "If the grievance relates directly to actions of the Grievance Officer, the inmate will send the complete Inmate Grievance Form directly to the Warden," who will appoint a third-party to serve as Grievance Officer for that particular grievance. *Doc. 69-2* at 6. In Steps 2-3 of the grievance process, the Grievance Officer reviews the grievance for proper time limits and necessary information, conducts an investigation, and completes the Grievance Officer's report portion of the Inmate Grievance form. *Doc. 69-2* at 7,12-13. The Grievance Officer's report and recommendation will be completed and delivered to the Warden for review within 15 working days from the receipt of the inmate's grievance. *Doc. 69-2* at 7. "Any disposition recommended by the Grievance Officer may [then] be approved, disapproved or modified by the Warden" within 15 working days of receipt of the grievance by the Warden. *Doc. 69-2* at 7. This is Step 4 of the grievance process. *See Doc. 69-2* at 13. If an inmate is not satisfied with the Warden's decision, he may appeal that decision to the Office of the Secretary of Corrections within five working days. *Doc. 69-2* at 8. "The Secretary, Director of Adult Prisons, or designee, will [then] render a final decision of the grievance[.]" *Doc. 69-2* at 8. This is Step 5, the final step of the grievance process. *See Doc. 69-2* at 13.

Inmates may file emergency grievances. "An emergency grievance shall be given priority." *Doc. 69-2* at 2. If the Grievance Officer determines that the grievance is in fact an emergency grievance, it will immediately be forwarded to the Warden "to correct the situation." *Doc. 69-2* at 2. Denial of an emergency grievance by the Warden "may be immediately appealed to the State wide Grievance/Disciplinary Appeals Manager." *Doc. 69-2* at 2.

"Grievances shall be processed in a timely manner" and will be resolved no later than 90 working days from the filing of a grievance by an inmate to the appeal decision. *Doc. 69-2* at 7. "In the event the grievance is not disposed of within the specified time limits, the inmate shall be deemed to have exhausted administrative remedies for that specific complaint." *Doc. 69-2* at 2.

a. Any matter over which the Corrections Department has no control, for example: parole decisions, sentences, and claims regarding inmate compensation which is regulated by statute.

b. Matters involving the loss or delay of mail by the U.S. Postal Service or other carriers, e.g. UPS, Federal Express, etc.

c. **Any matter involving disciplinary procedure and findings. A separate appeal process is provided by Department policy for disciplinary actions.**

d. **Any matter involving a classification decision. A separate appeal process is provided by Department policy for classification actions or placement in Special Management.**

e. Complaints on behalf of other inmates.

f. The subject of any prior grievance on which a final determination has been made or which is currently under review.

g. Other matters beyond the control of the Department.

*Doc. 69-2* at 1 (emphasis added). Thus, the DOC applicable regulations expressly exclude disciplinary and classification decisions from grievable matters and provide independent appellate processes. *Doc. 69-2* at 1; *see also Doc. 69-1* at 2-3.

An inmate who disagrees with a disciplinary decision[7] of a hearing officer may appeal the decision within 15 calendar days of receipt of the decision by filing the completed appeal form and any attachments with the Warden's designated appeal Disciplinary Officer. *Docs. 69-50* at 12; *69-51* at 12. "The appeal shall be decided within thirty (30) calendar days of its receipt by the Warden's office and the inmate shall be promptly notified in writing of the results." *Doc. 69-50* at 12. "The decision of the Warden may [then] be subject to review by the Cabinet Secretary of Corrections or designee."

---

[7] Defendants cite only to the current version of the Inmate Discipline Policy, as it is "substantially similar to earlier versions." *Doc. 69* at 14. Plaintiff does not argue that there are any pertinent differences in the policies and so the Court employs the same practice.

*Doc. 69-51* at 12. "There is no absolute right of appeal to the Secretary. However, the Secretary, Director of Adult Prisons or designee shall have final authority in reviewing the Warden's summary, findings and conclusions." *Doc. 69-52* at 2.

As to classification issues, [8] "[a]n inmate who disagrees with an institutional classification decision has the right to appeal the action through established channels. The inmate may appeal the decision to the facility Warden and the Warden's decision will be the final authority." *Doc. 69-44* at 1. "Classification issues which may be appealed to the Warden include, but are not limited to: decisions involving custody classification; work or education program assignments; inter/intra-state facility transfers; family visits and good time decisions[.]" *Doc. 69-44* at 1. To initiate an appeal, "[a] written classification appeal should be filed using the Inmate Classification Appeal form (CD-08-0102.10) and submitted to the Institutional Classification Appeals Officer" within 15 calendar days of the classification decision. *Doc. 69-44* at 1. The Institutional Classification Appeals Officer will then conduct an investigation and deliver a recommendation to the Warden for review within 20 days. *Doc. 69-44* at 2. The Warden then makes a final decision on the appeal within 15 calendar days. *Doc. 69-44* at 2.

### B) Exhaustion Analysis

Plaintiff was (and remains) incarcerated, and his claims arise out of prison life. Therefore, the exhaustion requirements of the PLRA apply. *See Norton v. City of Marietta, Okla.*, 432 F.3d 1145, 1150 (10th Cir. 2005). The question presented is whether Plaintiff properly exhausted his administrative remedies before bringing his First and Eighth Amendment claims in this Court.

---

[8] While Defendants attached five versions of the classification policy to the *Martinez* Report, they only reference the version of the policy in effect when Plaintiff was reclassified from Level III to Level IV and placement at PNM.

10

Defendants maintain that Plaintiff failed to exhaust his administrative remedies before filing this lawsuit. *See Doc. 69* at 27. As to Plaintiff's First Amendment claim, Defendants concede that this claim was exhausted, but they assert that it was only done so **after** the present lawsuit was filed. *Doc. 69* at 28. This claim admittedly was exhausted through the grievance procedure outlined above while Plaintiff was incarcerated at PNM; it was initiated as an informal grievance on September 23, 2015, (the same date Plaintiff filed his original complaint in this case) and was not exhausted until the Director of Adult Prisons denied Plaintiff's Level 5 appeal on November 21, 2015. *Doc. 69-69* at 2-3. Nevertheless, the Sixth, Seventh and Ninth Circuits have held that "the PLRA and Federal Rule of Civil Procedure 15 permit a plaintiff to amend his complaint to add claims that were exhausted after the commencement of the lawsuit, provided that the plaintiff's original complaint contained at least one fully exhausted claim." *Mattox v. Edelman*, 851 F.3d 583, 594 (6th Cir. 2017).

The Court must therefore examine the Eight Amendment claim raised in the original Complaint and whether it was "fully exhausted." As Plaintiff points out and Defendants admit, "[i]nmates may not grieve their placement according to the general grievance policy[.]" *Doc. 69* at 13; *Doc. 89* at 6. Rather, as discussed above, inmates may only *appeal* their classification and, therefore, placement. While Defendants' *Martinez* Report inexplicitly omits documents related to Plaintiff's appeal of the classification decision, Defendants admit that he "can and did appeal the classification decision as provided in the Classification policy, and the decision was affirmed." *Doc. 69* at 17; *see also Doc. 69* at 15. If Plaintiff's only avenue for relief lies in an appeal of the classification decision (of which he took advantage), then it would appear Plaintiff has

complied with his obligation to exhausted the issue of his classification as a Level IV inmate, which led to his transfer to PNM. As Defendants acknowledge, "Plaintiff's claims primarily concern his housing placements while he was housed at PNM[,]" *Doc. 69* at 6, and they identify no further exhaustion requirement Plaintiff was to complete. Accordingly, the Court finds that Plaintiff properly exhausted the issue of his placement at PNM.[9]

Because the Court finds that his original Complaint arguably contained an exhausted Eighth Amendment claim, the Court will not dismiss Plaintiff's First Amendment claim based upon Plaintiff's failure to exhaust prior to initiating this suit. To do so would fly in the face of judicial economy and the mandates of the Federal Rules,

---

[9] In reaching this finding, the Court recognizes that "futility is not an excuse to the PLRA's exhaustion requirement." *Griffin v. Romero*, 399 F. App'x 349, 351-52 (10th Cir. 2010) (citing *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001)).

In *Sparks v. Foster*, 241 F. App'x 467 (10th Cir. 2007) (unpublished), the Tenth Circuit seemed to imply that even if a State's prison regulations prohibit grievances related to classification decisions, a plaintiff protesting a classification decision is still required to submit a grievance in order to satisfy the exhaustion requirement. A closer reading of *Sparks*, however, reveals that the plaintiff there had failed to exhaust an Eighth Amendment claim that indeed was covered by the Colorado grievance procedure. There, the plaintiff alleged that a correctional officer "forced him to cross a prisoner strike to work in the kitchen despite inmate threats to any prisoner who crossed the line." *Id.* at 468. He further alleged that he "was selected based upon his [Security Threat Group] classification" so that officials "could use his leadership role within the prison population to diffuse the volatile situation." *Id.* The *Sparks* plaintiff argued that

> his grievance was a classification issue and not subject to review through the grievance procedures. In his reply brief, Sparks alleges he requested a grievance on the issue, but his case manager directly prevented him from filing grievances. Other circuits have held that administrative remedies are not "available" when prison officials refuse to provide prisoners with grievance forms. Sparks' attempts to frame the issue under this precedent on appeal is too little, too late. . . . Thus, Spark's claim the administrative procedures were futile does not excuse a lack of exhaustion.

*Id.* at 473-74. Thus, the Tenth Circuit implicitly rejected the inmate's characterization of his Eighth Amendment claim as an ungrievable classification issue, and then dismissed his "futility" theory that grievance procedures were unavailable because Sparks' belated assertion that guards refused to provide him with a grievance form was unsupported.

which are to "be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

## IV. The Merits

In order to avoid summary judgment, Plaintiff must come forward with evidence in support of his First and Eighth Amendment claims. For the reasons that follow, the Court finds Defendants are entitled to judgment as a matter of law.

### A) Eighth Amendment/Classification Claim

Plaintiff alleges that Defendants' deliberate indifference to his safety violated his rights under the Eighth Amendment. *See Doc. 11* at 13. "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners" such that "[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Benefield v. McDowall*, 241 F.3d 1267, 1270-71 (10th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).

"[I]n order to establish a cognizable Eighth Amendment claim for failure to protect, a plaintiff 'must show that he is incarcerated under conditions posing a substantial risk of serious harm,' the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." *Id.* at 1271. Plaintiff asserts that he meets this burden based upon the "simple fact . . . that Defendants failed to protect Plaintiff from abuse at the hands of other inmates." *Doc. 89* at 1. The Court agrees with Defendants, however, that Plaintiff has failed to establish either of the required components to establish a viable claim.

First and foremost, "[p]rison officials cannot be held liable . . . where they know of a risk to inmate safety and respond reasonably to it." *Allen v. Zavaras*, 430 F. App'x 709, 711 (10th Cir. 2011) (citing *Farmer*, 511 U.S. at 844). *Allen* demonstrates why. There, the plaintiff (also a sex offender) alleged that certain staff members were deliberately indifferent to various threats and assaults he sustained. *Allen*, 430 F. App'x at 711. The Tenth Circuit disagreed, finding that all but one defendant had reasonably responded to the risks of harm facing the inmate by moving the plaintiff to different units or by removing his assailants. *Id.* at 712. The court granted the remaining defendant qualified immunity, finding that the plaintiff failed to demonstrate that he had *actual* knowledge of the risk of the plaintiff's safety. *Id.* at 713.

In this case, Defendant Vigil has averred that Plaintiff was moved to different pods every time he complained that he was unsafe. *Doc. 69-78* at 3. Moreover, Plaintiff was never housed in a pod with inmates that he identified as his enemies. *Id.* Finally, Plaintiff fails to demonstrate how any of the Defendants were actually aware of a substantially serious risk to his safety. Thus, Plaintiff has failed to demonstrate that Defendants were subjectively deliberately indifferent to his plight.

Plaintiff also fails to produce evidence sufficient to preclude summary judgments as to the objective component – that he is "incarcerated under conditions posing a substantial risk of serious harm." Plaintiff's Complaint and Response to the Supplemental *Martinez* Report consistently assert that he is at risk of harm due to the nature of his conviction – *i.e.,* because he is a sex offender. However, in *Riddle v. Mondragon*, 83 F.3d 1197 (10th Cir. 1996), the Tenth Circuit held that similar conclusory "allegations fail to state an Eighth Amendment claim for alleged failure to protect the

14

plaintiffs' safety." 83 F.3d at 1205. Importantly, the Court recognized that "one does not have to await the consummation of threatened injury to obtain preventative relief." *Id.* (citing *Farmer*, 114 S. Ct. at 1983). Yet the *Riddle* court's import is clear – one's mere status as a sex offender is insufficient to put prison officials on notice of an objective risk of serious harm *Id.* Here, Plaintiff provides no other evidence that showing of a substantial risk of serious harm throughout his stay at PNM. *Id.*; *see also Casanova v. Ulibarri*, 622 F. App'x 724, 729 (10th Cir. 2015) (citing *Riddle* for the proposition that "the plaintiff must show more than a conclusory claim of being afraid"); *Allen v. Figuera*, 416 F. App'x 771, 775 (10th Cir. 2011) ("conclusory allegations will not defeat a motion for summary judgment").

Accordingly, for the reasons stated, the Court recommends that summary judgment be entered for Defendants on Plaintiff's Eighth Amendment claim.

**B) First Amendment Retaliation Claim**

"It is well-settled that '[p]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts.'" *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (quoting *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990)). "This principle applies even where the action taken in retaliation would be otherwise permissible." *Smith*, 899 F.2d at 948. In order to prove Defendant Vigil's liability for retaliation, Plaintiff must show that

> (1) he was engaged in a constitutionally protected activity; (2) the defendant[] caused him "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) the defendant['s] action "was substantially motivated as a response to [Plaintiff's] exercise of constitutionally protected conduct.

*Turner v. Falk*, 632 F. App'x 457, 460 (10th Cir. 2015).

15

Clearly, Plaintiff has shown that he was engaged in a constitutionally protected activity – filing and litigating a Section 1983 lawsuit. The Court also assumes *arguendo* that Plaintiff's allegations meet the second prong of the test; that is, an inmate of ordinary firmness would be chilled from litigating in the face of the alleged retaliatory acts. However, because Plaintiff fails to meet the final prong, Defendants are entitled to summary judgment on the First Amendment claim.

To satisfy the third prong, Plaintiff must show that "but for the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place." *Turner*, 632 F. App'x at 460 (citing *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir.1998)). An inmate claiming retaliation must "allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Peterson*, 149 F.3d at 1144 (quoting *Frazier v. Dubois*, 922 F.2d 560, 562 n. 1 (10th Cir.1990)). The Court concludes that Plaintiff's allegations of retaliation fail because he has presented no evidence that Defendant Vigil's alleged retaliatory motive was the "but for" cause of his actions towards Plaintiff. *See Peterson*, 149 F.3d at 1144 ("Peterson's remaining allegations of retaliation are based on mere speculation rather than evidence.").

As noted, Plaintiff alleges that Defendant Vigil undertook three retaliatory acts: (1) refusing to transfer Plaintiff to a different pod for his safety, (2) directing a search of Plaintiff's cell during which a piece of contraband (metal) was found, and (3) informing other guards that Plaintiff was "writing notes" on other inmates. However, Plaintiff has failed to rebut Defendant Vigil's testimony that Ellis was transferred to several different pods when he claimed he was unsafe. *See Docs. 69-78* at ¶ 9. Plaintiff fails to produce evidence establishing a connection between the search of his cell that uncovered

contraband and the filing of his lawsuit; indeed, there is no evidence that Defendant Vigil directed, ratified, reviewed or in any other way took any part in the search. *See Doc. 69-102* at 1.[10] Finally, Plaintiff has presented no evidence that Defendant Vigil ever in fact labeled him a snitch. This is particularly troubling, as Plaintiff goes so far as to name the inmate (Francisco Montano) who allegedly told him about Defendant Vigil's actions name and Eric Schlotterer as the Officer who allegedly passed on this information. Yet Plaintiff has made no effort to secure any proof for this allegation. *Compare Doc. 11* at 8 *with Doc. 89*.

An inmate's mere speculation that actions taken by correctional officials were in retaliation for the exercise of his First Amendment rights cannot defeat summary judgment. *Peterson*, 149 F.3d at 1144; *see also Banks v. Katzenmeyer*, 645 F. App'x 770, 774 n.2 (10th Cir. 2016) ("'A plaintiff's subjective beliefs about why the government took action, without facts to back up those beliefs, are not sufficient to create a genuine issue of fact' concerning [a] First Amendment retaliation claim.") (quoting *Nielander v. Bd. of Cty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009)). Here, Plaintiff's claims against Defendant Vigil appear to be based on just that, speculation. Accordingly, the Court recommends that summary judgment be granted on this claim as well.

### V. **Motions to Amend and Supplement the Complaint**

Finally, the Court recommends that Plaintiff's most recent motions to amend and supplement the Complaint be denied. *See Docs. 83, 85, 87*.

---

[10] Additionally, while Plaintiff protests the manner and timing of the search, he conveniently fails to mention that in addition to the metal that was discovered in his cell, the corrections officers discovered a homemade rope. *See Doc. 69-101* at 3.

Plaintiff's Motion to Supplement (*Doc. 83*) sets forth no new transaction, occurrence, or event that happened after the date of the pleading to be supplemented, as required by Federal Rule of Civil Procedure 15(d). Rather, Plaintiff merely reargues the merits of his claims and takes issue with Defendants' attempts to "paint [him] in a negative light" by bringing to this Court's attention various incidents in which he has recently been involved. *See generally Doc. 83.*

Plaintiff's Motions to Amend the Complaint should be denied as futile. These Motions seek to add another inmate, Paul Cain, to the Complaint and to assert a retaliation claim on his behalf. *See Docs. 85*, *87*. Plaintiff also seeks to name as Defendants disciplinary hearing officers from the Otero County facility. *Doc. 87*. However, in a filing entitled "Ex Parte Communication" filed by Mr. Cain, he admits that he has not exhausted his administrative remedies as to this purported cause of action. *See Doc. 85*. As this Court has previously recognized, "[d]enial of a prisoner's motion to amend as futile is warranted where the amended complaint 'would be doomed for lack of exhaustion.'" *Doc. 76* at 7 (quoting *Hunsaker v. Alexander*, 520 F. App'x 717, 719 (10th Cir. 2013)). If Mr. Cain wishes to pursue a retaliation claim in federal court, he must exhaust his administrative remedies or otherwise demonstrate why they are unavailable. Until he does so, the proposed amendment is futile.

## VI.     Conclusion

Plaintiff admits that "[i]t appears possible the Plaintiff was trying to facilitate a transfer to LCCF to be closer to his brother but this still does not negate Defendants (sic) responsibility to protect him from a real threat to his safety." *Doc. 89* at 9. The Court agrees with Plaintiff that if there was a "real threat to his safety," then Defendants

would be required to address it. However, the record before the Court does not support a threat to Plaintiff's safety, nor any deliberate indifference of any Defendant to any threats against Plaintiff while he was housed at PNM. Additionally, Plaintiff has failed to produce evidence demonstrating that Defendant Vigil took any action in retaliation for the filing of the present lawsuit. Accordingly, the Court recommends that District Judge Herrera deny Plaintiff's pending motions to amend and supplement the complaint, grant summary judgment to Defendants on all claims, and dismiss this action with prejudice.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).
**A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES CHIEF MAGISTRATE JUDGE